United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

K,H., by and through her parents, MICHAEL and ALANY HELMANTOLER,

Plaintiffs,

v.

MT. DIABLO UNIFIED SCHOOL DISTRICT,

Defendant.

/

No. C 04-05400 SI

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

On January 6, 2006, the Court heard argument on the parties' cross-motions for summary judgment. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS defendant's motion and DENIES plaintiffs' motion.

## BACKGROUND

This is an action brought under the Individuals with Disability in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Through her parents – referred to in this order as plaintiffs – a developmentally disabled 7-year old girl seeks judicial review of the decision of a California Special Education Hearing Officer ("SEHO") regarding her proper educational placement. The SEHO affirmed the decision by the Mt. Diablo Unified School District ("the District") to place plaintiffs' daughter in a classroom for severely handicapped students. Plaintiffs argue that their daughter should be placed in a "total communication" classroom and that the District should have provided her with more instruction and services.

**I. The Individuals with Disabilities in Education Act**

Congress passed the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A). To achieve this goal, the Act relies on a cooperative process between parents and schools. *See generally Schaffer v. Weast*, -- U.S. --, 126 S. Ct. 528 (2005). Central to this cooperative process is the individualized education plan ("IEP").

An IEP is created for every disabled student, and serves as a road map for the student's education. *Id.* at 532; *see also* 20 U.S.C. § 1414. "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer*, 126 S. Ct. at 532. State educational authorities have a duty to identify and evaluate disabled children and develop an IEP for each one. *Id.* In addition, IEPs must be reviewed at least once a year. *Id.*

Parents play a significant role in the IEP process. As the Supreme Court explained:

> [Parents] must be informed about and consent to evaluations of their child under the Act. [20 U.S.C.] § 1414(c)(3). Parents are included as members of "IEP teams." § 1414(d)(1)(B). They have the right to examine any records relating to their child, and to obtain an "independent educational evaluation of the[ir] child." § 1415(b)(1). They must be given written prior notice of any changes in an IEP, § 1415(b)(3), and be notified in writing of the procedural safeguards available to them under the Act, § 1415(d)(1). If parents believe that an IEP is not appropriate, they may seek an administrative "impartial due process hearing." § 1415(f).

*Id.* If the parents of a disabled student do not prevail at the administrative due process hearing, they may, as plaintiffs here have done, seek review through a civil action in state or federal court. 20 U.S.C. § 1415(i)(2).

**II. Factual and Procedural Background**

Plaintiffs in this case are the parents of K.H., a seven-year old girl who lives in Concord, California. Decl. of Kimberly Eckhart in Support of Pl. Mot. ("Eckhart Decl."), Exh. 1 at 5. In September 2001, shortly after her third birthday, K.H. was assessed by Mount Diablo Unified School District ("District") to determine if she was eligible for special education services. *Id.* The assessment found that K.H. functioned at a level equivalent to a 22-month old child, approximately 15 months

younger than her actual age. *Id.*; Eckhart Decl., Exh. 2 at 6. K.H.'s most significant developmental delays were found in her language skills. Eckhart Decl., Exh. 2 at 5, 8. The assessment determined that K.H.'s language skills were in the first percentile for children her age, and stated that her "receptive and expressive language skills" were "significantly depressed." *Id.*[1] The assessment made no determination of K.H.'s cognitive potential, stating that such a determination could not be made because of "delays in speech and language and motor skills and her vision defects which affect her performance." *Id.* at 8.

On September 25, 2001, K.H.'s IEP team met to review the results of the assessment. Eckhart Decl., Exh. 32. She was deemed eligible for special education services from the District, and was placed in a preschool special day class for communicatively handicapped children, starting October 1, 2001. Eckhart Decl., Exh. 1 at 5-6.

A few days after the District conducted its assessment, K.H. was tested by Children's Hospital in Oakland. *See* Eckhart Decl., Exh. 31. That test concluded that her intellectual functioning was "significantly delayed for her age," and noted that her symptoms, test results, and observed behaviors were consistent with mild to moderate mental retardation. *Id.* at 2.

K.H.'s mother provided this report to her preschool teacher at the end of November 2001. Eckhart Decl, Exh. 1 at 6; Exh. 4. Based on the report, the preschool teacher recommended transferring K.H. to a class for severely handicapped students. Eckhart Decl, Exh. 1 at 6; Exh. 4. K.H. started in the new class in the beginning of December 2001; in February 2002, however, K.H.'s mother decided that the placement was not appropriate for her, and withdrew her from the class. Eckhart Decl, Exh. 1 at 6; Exh. 4. In March 2002, K.H.'s mother agreed to return her to the severely handicapped class, but for fewer hours per week so K.H. could participate in other activities. Eckhart Decl, Exh. 1 at 6.

Over the summer of 2002, K.H.'s parents disputed her placement in the severely handicapped class. *Id.* In September and October 2002, the parties reached an agreement as to K.H.'s placement. *Id.* Under the agreement, K.H. returned to a communicatively handicapped class in a District school.

---

[1]Although the assessment does not mention the diagnosis, plaintiffs' brief states that K.H. was earlier diagnosed with apraxia, "an oral motor disorder which affects the ability to articulate." Pl. Opening Br. at 3.

United States District Court
For the Northern District of California

*Id.* She also attended classes twice a week at a private preschool that had a student population that consisted primarily of typically developing children. *Id.* K.H. remained in both classes for the rest of the 2002-2003 regular school year. *Id.*

In March 2003, the IEP team met to discuss K.H.'s placement for the 2003-2004 school year. *Id.* The parties agreed that K.H. would be placed in a severely handicapped class for the year, and that her "academics will be supported with sign language." *Id.* at 7; Exh. 5 at 1. The IEP team also agreed to meet "within [the] first 5-7 weeks [of the] 2003-2004 school year to determine [the] appropriate amount of [general education] inclusion for the student." Eckhart Decl., Exh. 5 at 1.

In September 2003, the IEP team met and decided that K.H. should spent 100 minutes per day in general education, four days per week, accompanied by her teacher or classroom assistant. Eckhart Decl., Exh. 1 at 7. This arrangement was maintained until December 2003, at which time the IEP team determined that the general education time was not helpful for K.H., and decided to return her to her severely handicapped class for the 400 minutes a week she had spent in general education. *Id.*

In December 2003, K.H. underwent a triennial reassessment of her development, conducted by five District employees. *Id.* at 7-8. She was also referred to Dr. Carina Grandison, a neuropsychologist at Children's Hospital, for an independent assessment, although that assessment was not completed until May 2004. *Id.* Based on its assessment, the District recommended changing K.H.'s classification to "mildly cognitively impaired." *Id.* In April 2004, the IEP team met to decide upon K.H.'s placement for the 2004-2005 school year. The team agreed on placement in a severely handicapped classroom, with some exposure to mainstream students. *Id.* at 8. K.H.'s mother signed the document, but revoked her consent three days later by letter. *Id.*

In May 2004, Dr. Grandison issued her report. She diagnosed K.H. with "severe language impairment, specifically verbal apraxia," "mild mental retardation," and "significant motor problems and dyspraxia." Eckhart Decl., Exh. 7 at 5. She also recommended that K.H. receive one-half hour of speech-language therapy per day, additional occupational therapy and physical therapy, and a year-round program with only a two-week break in the summer. *Id.*

Dr. Grandison met with the IEP team in June 2004 to discuss her findings. The District accepted her diagnoses, but rejected her recommendations as to K.H.'s needs. Eckhart Decl., Exh. 1 at 8, Exh.

United States District Court
For the Northern District of California

39. K.H.'s mother refused to sign the IEP and later requested a due process hearing. *Id.* at 8-9.

The SEHO held a hearing over eleven days between July 22, 2004, and August 12, 2004, during which nineteen witnesses testified. Plaintiffs were unrepresented by counsel at the hearing. On September 23, 2004, the SEHO issued a 51-page, single-spaced decision, affirming the District's position in almost all respects. *See* Eckhart Decl., Exh. 1. K.H. has been home schooled since that time.

In December 2004, plaintiffs filed this action, seeking review of the SEHO's decision. Specifically, plaintiffs challenged the District's IEP for 2003-2004, for the summer of 2004, and for 2004-2005. In November 2005, both parties filed cross motions for summary judgment. For the following reasons, the Court GRANTS defendant's motion and DENIES plaintiffs' motion.

**LEGAL STANDARD**

A district court reviewing the decision of an administrative due process hearing under the IDEA sits in an unusual position. The statute provides that a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). By allowing a district court to consider materials outside the administrative record and by imposing a preponderance of the evidence standard of review, the IDEA allows a district court to conduct a more searching review than is typical of agency decisions.

While a district court's review under the IDEA is therefore less restricted than its review of other administrative decisions, the Supreme Court has made clear that this is in no way permission for "courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S. Ct. 3034 (1982). Rather, courts must give "due weight" to the state court proceedings. *Id.* A court must consider the administrative findings "carefully and endeavor to respond to the hearing officer's resolution of each material issue, but the court is free to accept or reject the findings in part or in whole." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (internal quotation marks omitted).

Ultimately, the degree of deference to give the hearing officer's determination is a matter of

district court discretion. *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1474 (9th Cir. 1993). Various factors affect how much deference should be afforded the administrative decision. "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'" *Wartenberg*, 59 F.3d at 892; *see also County of San Diego v. Calif. Special Ed. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) ("This circuit gives the state hearing officer's decision 'substantial weight' when it 'evinces his careful, impartial consideration of all the evidence and demonstrates his sensitivity to the complexity of the issues presented.'"). In addition, "a reviewing court that has before it evidence not considered at the administrative level will naturally defer less to the administrative decision . . . ." *Sch. Dist. of Wis. Dells v. Littlegeorge*, 295 F.3d 671, 675 (7th Cir. 2002).

A district court's review should focus on both procedural and substantive aspects of the decision below: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-07. The moving party bears the burden of proving SEHO's decision was contrary to preponderance of evidence. *Clyde K. v. Puyallup Sch. Dist. No. 3*, 35 F.3d 1396, 1399 (9th Cir. 1994).

## DISCUSSION

As a preliminary matter, the Court must determine the level of deference it should afford the SEHO's decision. In this instance, the Court finds that the SEHO's decision is entitled to considerable deference. The SEHO heard a great deal of evidence, holding a hearing that took place over eleven days during a span of almost three weeks. Exh. 1 at 1. In total, nineteen individuals testified at the hearing, producing a voluminous record. *Id.* After considering this evidence, the SEHO produced a thorough, well-written decision that spans 51 single-spaced pages. In the Court's view, both the diligence with which the SEHO approached this task, and the administrative expertise that the SEHO represents, weigh heavily in favor of significant deference to the SEHO's findings. *See County of San Diego v. Calif. Special Ed. Hearing Office*, 93 F.3d at 1466 (holding that deference to hearing officer's decision is

highest when that decision is thoughtful and careful); *Wartenburg*, 59 F.3d at 892 ("[D]eference to the hearing officer makes sense in a proceeding under [the IDEA] [because of] agency expertise, the decision of the political branches . . . to vest a decision initially in the agency, and the costs imposed on all parties of having still another person re-decide the matter from scratch.") (internal quotation marks omitted).

Plaintiffs therefore have a substantial burden to overcome if they are to convince this Court that the SEHO's decision should be overturned. Plaintiffs have not met this burden. Neither the evidence in the administrative record, nor the supplemental evidence that plaintiffs have introduced, convinces the Court that the SEHO's decision was flawed.[2]

Plaintiffs' challenges to the SEHO's decision can be loosely categorized into three groups. First, plaintiffs challenge the procedural aspects of the District's IEP, and specifically whether the District's assessments that the SEHO relied upon were sufficient. Second, plaintiffs challenge the instruction and services that the District provided to K.H., arguing that the SEHO should have ordered increased sign language and auditory rehabilitation. Finally, plaintiffs argue that placing K.H. in a classroom for severely handicapped students is not the least restrictive placement, and that she should be placed in a "total communication" classroom. The Court considers each of these arguments in turn.

## I. Challenges to Assessments

Plaintiffs challenge the District's assessments of K.H. in two ways. Plaintiffs' primary argument is that the District's determination that K.H. did not have a hearing impairment was incorrect. Plaintiffs also argue that any assessments of K.H. are flawed because they were not conducted in K.H.'s native language of a combination of speech and sign.

---

[2]In a previous order, the Court allowed plaintiffs to supplement the record with evidence that was not before the SEHO. For the reasons discussed below, the Court does not believe this evidence, most of which was gathered in late 2005, is sufficient to call into question the SEHO's decision regarding K.H.'s educational needs during 2003 and 2004. While the Court does not find the supplemental evidence particularly probative of K.H.'s past educations needs, the same cannot be said of its relevance to K.H.'s needs going forward. To the contrary, the Court believes the supplemental evidence is significant and raises new issues that must be examined as K.H.'s development progresses, and that it should be utilized to the fullest extent in the planning of K.H.'s future education.

**A. Hearing Impairment**

California Education Code § 56320 states that "[b]efore any action is taken with respect to the initial placement of an individual with exceptional needs in special education instruction, an individual assessment of the pupil's educational needs shall be conducted." This section requires that a pupil must be assessed "in all areas related to the suspected disability." *Id.* Federal law imposes a similar obligation. *See* 34 C.F.R. § 300.532(g) (establishing duty to assess children "in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities"); *see also W.B. v. Matula*, 67 F.3d 484, 501 (3d Cir. 1995) ("[T]he statutes and regulations . . . clearly establish the obligation to identify and evaluate disabled children.").

Plaintiffs argue that K.H.'s hearing should have been an area of suspected disability and that she therefore should have been tested for a hearing impairment.[3] Plaintiffs advance two theories of hearing impairment: first, that K.H. actually suffered from hearing loss; second, that K.H. suffered from central auditory processing disorder ("CAPD").

**1. Hearing Loss**

The Court agrees with the SEHO's determination that there was no reason to suspect that K.H. suffered from hearing loss. Assessments taken in October 2000 and October 2001 both found that K.H.'s hearing fell within normal range. *See* Eckhart Decl., Exhs.1, 34, 35. More recent, less formal, hearing tests were also conducted. For instance, a May 2003 health report required for K.H's school attendance indicated that she received an audiometric screening, and no abnormal results were reported. Eckhart Decl., Exh. 1 at 15; A.R., Def. Exh. 75. Further, K.H.'s mother reported at an October 2002 IEP team meeting that K.H. had taken a hearing test in August 2002. *Id.*; A.R., 8/10/04 Tr. at 69-70;

---

[3]The precise question before the Court is not whether K.H. actually has a hearing impairment, but whether she exhibited signs of impaired hearing sufficient to render it an area of suspected disability. *See Adams v. State of Oregon*, 195 F.3d , 1149 (9th Cir. 1999) ("Actions of the school systems cannot . . . be judged exclusively in hindsight . . . . [A]n [IEP] is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted.") (quoting *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3d Cir.1993)).

A.R., 8/6/04 Tr. at 160-164. While K.H.'s mother could not elaborate about the precise results of the test, it is clear that following the test she was not concerned about hearing loss. *See* A.R., 8/10/04 Tr. at 69-70; A.R., 8/6/04 Tr. at 160-64; *see also* A.R., Pl. Exhs., Tab VII at 31 (indicating that K.H. passed hearing test in August 2002). In addition, numerous witnesses who worked with K.H. testified at the hearing that they were not concerned about K.H.'s hearing. Eckhart Decl., Exh. 1 at 15; *see, e.g.*, A.R., 8/12/04 Tr. at 87 ("I feel that [K.H.] has always been able to hear us."); A.R., 8/11/04 Tr. at 42 (saying that K.H. should not be placed a total communication class because "I don't think that a hearing child should . . . be placed with a class of . . . hard-of-hearing [students]"). Finally, K.H.'s mother testified on the last day of the hearing that very recent testing revealed that K.H. did not have hearing loss. Eckhart Decl., Exh. 1 at 15; A.R., 8/12/04 Tr. at 254 ("[H]er hearing test came up normal . . . but they also said they cannot rule out fluctuating hearing loss."). A very recent audiological exam from November 2005 confirmed this understanding. Eckhart Decl., Exh. 10 ("Pure tone thresholds withing grossly normal limits in both ears, ruling out hearing loss as an explanation of the reported problems.").

Plaintiffs' arguments against the SEHO's findings are not convincing. While there is some evidence that K.H. failed two screening tests, the evidence consists of nothing more than informal notes to K.H.'s parents, informing them that K.H. failed a screening test, and recommending further evaluation. Eckhart Decl., Exhs. 29, 30. Neither test concluded that K.H. was hearing impaired – it appears that K.H. failed at least one test because she did not pay attention – and neither appears to have been interpreted by anyone as a cause for alarm. More importantly, these tests are contradicted by the more recent evidence that K.H. hears normally, including the testimony of K.H.'s mother and the audiological assessment conducted by Judith Patton in November 2005. *See* Eckhart Decl., Exh. 10. Plaintiffs also point to a 2001 Children's Hospital of Oakland assessment of K.H. that diagnosed her with "fluctuating hearing loss." The SEHO specifically addressed this diagnosis, finding that such a condition is common in young children: "Ms. Peterson testified that this diagnosis indicates a temporary condition, caused by congestion and ear infections very common among young children . . . Ms. Peterson explained that sixty-percent to seventy-percent of all kindergarten students have fluctuating hearing loss." Eckhart Decl., Exh. 1 at 15; *see also* A.R., 7/29/04 Tr. at 146-47 (testimony of Peterson). Thus, the SEHO's finding that K.H.'s hearing ability was normal and was not an area of suspected

United States District Court
For the Northern District of California

disability is supported by a preponderance of the evidence.

### 2. Central Auditory Processing Disorder

Plaintiffs' other challenge to the SEHO's decision takes a slightly different tack. Rather than arguing that K.H. lacks the ability to hear, plaintiffs argue that she has a hearing impairment because her brain is unable to fully process the sounds that she heard – a condition known as CAPD.[4] The SEHO concluded that CAPD was not an area of suspected disability because K.H. "had global developmental delays, including cognitive impairment." Eckhart Decl., Exh. 1 at 16. The SEHO concluded that "because [K.H.'s] delays were global and her processing was not significantly lower than her cognition, she did not have a processing disorder."[5] *Id.*

Plaintiffs point to two sets of evidence to show that the SEHO was incorrect: evidence that was before the parties when K.H.'s IEPs were created, and two supplemental assessments performed in November 2005. As to the former, plaintiffs point out that numerous District employees have commented on K.H.'s limited auditory processing abilities. For example, K.H.'s September 2001 District assessment found that her "receptive and expressive language skills were significantly depressed when compared with her chronological age." Eckhart Decl., Exh. 2 at 8. The assessment found that she

---

[4]CAPD has been described by another court as follows:

> CAPD is a physical hearing impairment which affect[s] the hearing system beyond the ear, where meaning is extracted from non-essential background sound and delivered to the intellectual centers of the brain. An individual with CAPD suffers a reduced or impaired ability to discriminate, recognize or comprehend auditory information. He or she experiences difficulty listening to or comprehending auditory information despite exhibiting normal peripheral hearing sensitivity. This problem is most pronounced when the auditory signals are compromised by distortion, competition, poor acoustic environment or other reduction in signal clarity, strength or information content. Words may be drowned-out by other noises. Some words may sound like completely different words or as meaningless strings of verbiage. The CAPD students frequently misunderstand oral instructions or questions, need reiteration of directions or information, and experience difficulty understanding in the presence of the slightest background noise.

*Witbeck v. Embry Riddle Aeronautical Univ., Inc.*, 219 F.R.D. 540, 543 (M.D. Fla. 2004).

[5]Although plaintiffs criticize the SEHO for failing to consider CAPD as a hearing impairment, the SEHO addressed plaintiffs' argument that CAPD was an area of suspected disability. Whether interpreted as a hearing impairment or not, the SEHO clearly considered CAPD a condition that would have required addressing had it been an area of suspected disability.

was in the first percentile for auditory comprehension, and specifically noted that her "auditory processing skills vary" and that "there are concerns about [her] retention of information." *Id.* at 4. Others commented on K.H.'s short attention span and lack of ability to focus. *See* Eckhart Decl., Exh. 5 at 8 (noting K.H.'s inability to focus on a task for an extended period), Exh. 7 at 3-4 (commenting that K.H. was "easily distractible"); Decl. of Teri Stein in Support of Pl. Oppo. and Reply Br. ("Stein Decl."), Exh. 3 at 115-16 ("[K.H.] was able to attend for short periods during the assessment process. She required numerous breaks as well as a number of verbal redirections to gain her attention during the test."), Exh. 6 at 86 (testimony that K.H. was easily distracted). Dr. Merrilee P. McBride, a witness whose testimony is first before this Court, testified that these signs should have alerted the District to K.H.'s need for auditory support. *See* Stein Decl., Exh. 1 at 30 ("Those numbers would mean that we needed to look very deeply at what is happening with communication."), 33 ("I would say that her lack of access to language is slowing down her cognitive and . . . language concept development."), 67 (testifying that there were indications that the District needed to "look further").

The Court does not find this evidence sufficient to warrant finding that the SEHO's decision was erroneous. While McBride testified that the District should have provided K.H. with more auditory support, she did not testify that CAPD should have been an area of suspected disability. Indeed, plaintiffs acknowledge that McBride is not qualified to make such a diagnosis. Pl. Oppo. Br. at 9. Moreover, the majority of the evidence plaintiffs cite discusses K.H.'s short attention span and difficulty focusing. While some observers have commented that K.H. had difficulty following instructions, more frequently observers have commented on her inability to focus sufficiently to complete a task, not to her inability to understand directions. For example, notes of K.H.'s March 27, 2003, IEP meeting state that K.H.'s "short attention span interferes with her skills. She begins the activity but loses track of what the activity is about. For example, in sorting shapes on a peg, she begins with sorting by color but after 6 items, she begins stacking the objects until the spindle is full." Eckhart Decl., Exh. 5 at 8; *see also* Eckhart Decl., Exh. 7 at 3-4 (stating that K.H. had trouble "staying with" tasks and was easily distracted). Finally, as the SEHO discussed, K.H. "is significantly below same age peers in her nonverbal thinking and reasoning skills and adaptive functioning." A.R., Def. Exhs. at 191-194 (2004 assessment); *see also* Eckhart Decl., Exh. 7. Such cognitive delays can make diagnosing an auditory

United States District Court
For the Northern District of California

processing disorder difficult, especially with very young children. *See* Stein Decl., Exh. 8; *see also* Stein Decl., Exh. 16 at 14 ("When testing children below the mental age of 7 years, task difficulty and performance variability render questionable results on behavioral tests of central auditory functioning."); A.R., 8/4/04 Tr. at 59 ("[W]hat we look at as a processing disorder which means that there's a big discrepancy between the way she takes in and . . . learns that's different from her cognitive skills."). Thus, the Court does not believe that the SEHO erred in finding that CAPD was not an area of suspected disability.

The new evidence plaintiffs have provided to this Court does not change this conclusion. Plaintiffs have introduced an assessment performed in November 2005 by audiologist Judith Paton. *See* Eckhart Decl., Exh. 10. Paton found that K.H.'s hearing was normal, but found problems with her speech discrimination abilities, concluding that these results supported a diagnosis of CAPD. Eckhart Decl, Exh. 10, at 2. In addition, plaintiffs provided a communication evaluation from McBride, who found that K.H.'s communication difficulties were consistent with CAPD. Eckhart Decl., Exh. 12 at 7. This evidence, however, was produced well after the IEPs that plaintiffs challenge were created. Because this new evidence was not before the District at that time, it is not particularly probative of whether CAPD should have been an area of suspected disability in 2003 and 2004. Plaintiffs' new evidence does not establish that CAPD should have been apparent to the District; in fact, as discussed above, the evidence presented to the SEHO leads to the opposite conclusion.[6]

Given K.H.'s diagnoses of mental retardation, the Court cannot find that the SEHO erred in finding that auditory processing was not an area of suspected disability.

### B. Native Language

Under California and federal law, assessments must be made in a pupil's "native language or

[6]It may very well be that K.H. has an auditory processing disorder. Indeed, were this Court writing on a blank slate, it would be a close question. This Court is reticent to disregard the SEHO's expertise, however, and is also reluctant to allow its review to be governed by hindsight. *See Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). Thus, while the Court finds the Paton and McBride assessments to be persuasive support for the proposition that CAPD should be an area of suspected disability going forward, to the extent they were performed well after the IEP meetings and the SEHO's decision their probative value is therefore substantially diminished.

other mode of communication." 34 C.F.R. § 300.532(a)(1)(ii); Cal. Educ. Code § 56320(a). The parties do not dispute that, where language was used in testing K.H., the language used was English. Plaintiffs, however, argue that K.H.'s assessments should have been conducted in a combination of English and sign language because that is her primary form of communication. It appears that the District conducts assessments in a combination of speech and sign, when appropriate. Eckhart Decl., Exh. 15 at 184.

The SEHO considered this argument, and found that the evidence presented at the administrative hearing did not support plaintiffs' contention. To the contrary, the SEHO found that "consistent, credible evidence" revealed that "gestures and speech were [K.H.]'s primary means of communication," not English and sign language. Eckhart Decl., Exh. 1 at 14.

Plaintiffs do not present any new evidence on this point, but rather argue that the SEHO reached the wrong decision. First, plaintiffs argue that the SEHO only considered whether sign alone was K.H.'s native language. But while the SEHO spent the majority of the discussion covering K.H.'s sign abilities, her decision makes clear that she considered whether sign and English should be K.H.'s native language. *See* Eckhart Decl., Exh. 1 at 11 ("Student argues that the District failed to accurately assess her because District assessors failed to conduct testing in her native language of sign language and English."). Indeed, the SEHO found that "gestures and speech" were K.H.'s primary means of communication, indicating that she was aware that a combination of means of communication could constitute a native language.

As to the evidence presented at the administrative hearing, the bulk of the evidence confirms the SEHO's finding that K.H. did not utilize sign language enough for it to be considered a component of her native language. There was some testimony that K.H.'s mother and other family members signed to her at home. Eckhart Decl., Exh. 1 at 12. And a few of witnesses testified that they paired sign language with verbal instructions when they spoke with K.H. *See, e.g.*, Eckhart Decl., Exh. 19 at 133; Exh. 21 at 63. Much of that testimony, however, was very equivocal. *See, e.g.*, Eckhart Decl., Exh. 19 at 165 (testifying that "K.H. never signs back to me," that instead "[s]he uses gestures" and that K.H. seemed to respond to verbal language rather than signs), Exh. 21 at 63 ("I think that sign helps support her speech . . . but I don't know if it . . . made the difference."), Exh. 23 at 204 ("[I]n hindsight . . . I realize that she always did better with the gestures or signs."). Indeed, the strongest endorsement of

United States District Court
For the Northern District of California

K.H.'s sign abilities came from Theresa Borges, her private preschool teacher, who testified that K.H. generally understood verbal instructions better when paired with sign. *Id.*, Exh. 1 at 13, Exh. 23 at 204. But even Borges testified only that gestural signs were K.H.'s primary mode of communication, and she explicitly distinguished gestural signs from sign language. A.R., 7/23/04 Tr. at 213-14. The SEHO found Borges to be a particularly credible witness. Eckhart Decl., Exh. 1 at 13 (commenting that Borges was an "objective, credible witness" because she was "not a District employee and . . . did not appear to tailor her testimony to either party's position").[7]

The SEHO considered this evidence and found it unconvincing in light of the substantial testimony about the limited manner in which K.H. used sign language, as opposed to gestures. *See* A.R., 7/30/04 Tr. at 132-33 (stating that K.H.'s primary means of communication was "her body, in other words she would like lead me to the place or the item that she wanted me to interact with her using that item or in that space," supplemented by vocalizations); A.R., 7/27/04 Tr. at 133 ("[S]he does the best for me when I use . . . verbal with gesturing and imitation."), 198 ("She doesn't gesture sign language to me. . . . She points to me or points to things for me."); A.R., 8/11/04 Tr. at 47 ("I never saw a real . . . elaborate gestural form at all."). In light of the thorough analysis in the SEHO's decision, the Court finds that plaintiffs have failed to establish that the SEHO erred. While there was some evidence regarding the usefulness of sign to help K.H. understand spoken words, the bulk of the evidence established that K.H.'s use of sign was very limited. Accordingly, the Court finds the SEHO did not err in finding that K.H.'s native language was gestures and speech, and that she therefore did not have to be assessed in a combination of English and sign language.

## II. Substantive Challenges

Plaintiffs' second argument is that the SEHO erred by failing to order the District to provide

---

[7]Plaintiffs also point to notations made on two documents as evidence that K.H.'s native language was a combination of English and sign language. The first document is a form prepared in connection with K.H.'s August 2004 IEP, and lists "Eng/[American Sign Language]" under "primary language." Eckhart Decl., Exh. 33. The second form consists of minutes of a March 2003 IEP team meeting, and states that K.H. "uses some verbal, automatic phrases and single word verbalizations as well as signs." *Id.*, Exh. 5 at 3. Neither document is particularly probative of K.H.'s primary form of communication.

additional instruction and services to K.H.. Specifically, plaintiffs argue that K.H. should have received increased speech therapy from a therapist fluent in sign language, and "auditory training and rehabilitation."

**A. Speech Therapy**

Plaintiffs first assert that K.H. should receive 120 minutes of speech therapy per week, arguing that the District's offer of 90 minutes per week is too little in consideration of assessments performed by Grandison and McBride. Grandison assessed K.H. in connection with the 2004 IEP. *See* Eckhart Decl., Exh. 5. She concluded that K.H.'s "severe language impairment," verbal apraxia, gave K.H. "tremendous" language and communication needs and suggested "[a]t least half an hour of intense speech and language therapy per day." *Id.* at 5, 7. McBride evaluated K.H. in April 2005, concluding that she required a "high level of SLP [speech-language pathologist] services of at least 120 minutes per week in a combination of settings." *Id.*, Exh. 12 at 11.

The SEHO rejected plaintiffs' request for additional speech therapy, finding that the 90 minutes proposed by the district was adequate. Eckhart Decl., Exh. 1 at 25-26. In reaching this conclusion, the SEHO relied heavily on the testimony of K.H.'s speech-language pathologist, Shirley Jack, whom the SEHO found to be a persuasive, credible witness. *See id.* at 27 ("Ms. Jack has worked extensively with [K.H.] and was a knowledgeable, experienced, credentialed speech therapist who provided thoughtful, independent testimony."). Jack testified that 90 minutes per week was sufficient to meet K.H.'s IEP goals. A.R., 7/30/04 Tr. at 152-53. She also testified that K.H. was highly motivated to communicate with her peers, and that speech opportunities in the classroom were important to K.H.'s development. *Id.* at 159-60. Because additional speech therapy time would have meant that K.H. would spend less time in the classroom with her peers, Jack felt that 90 minutes per week reached the proper balance. *Id.* at 212.

Plaintiffs argue that both McBride and Grandison recommended additional testing, but neither has worked with K.H. to the same extent as Jack. Moreover, neither McBride nor Grandison seems to have considered the tradeoff that increased speech therapy time would have meant for K.H.'s time with her peers. Further, as the SEHO noted, it is unclear whether Grandison's speech therapy

United States District Court
For the Northern District of California

recommendation was based upon a concern over the amount of time K.H. spent in speech therapy, or whether her overarching concern was that K.H. receive daily exposure to speech therapy. *See* Eckhart Decl., Exh. 1 at 26-27. While Grandison's report mentions that K.H. was receiving "daily speech and language therapy," she seemed confused on this point at the 2004 IEP meeting.[8] *See* A.R., 8/10/04 Tr. at 109-110 (testimony of Carrie Davis that Grandison did not appear familiar with the services K.H. was receiving from the District), 7/30/04 Tr. at 219; Velez Decl., Exh. 19 (informal transcript of 2004 IEP meeting). Plaintiffs' supplemental evidence simply is not strong enough to convince this Court that the SEHO's thoroughly reasoned decision was incorrect.

Plaintiffs also argue that K.H. should have been afforded comprehensive sign language support across all her academic environments. Although K.H.'s teacher and speech therapist know some sign language, they both admitted that they were not fluent in sign. *See* A.R., 7/30/04 Tr. at 123; 8/11/04 Tr. at 201-02. Plaintiffs argue that K.H. needs support from someone fluent in sign so that her communicative abilities can progress. *See, e.g.*, Stein Decl., Exh. 1 at 71-72 (McBride deposition). They also argue that defendants are in violation of K.H.'s IEPs, which state that K.H.'s "academics will be supported with sign language." Eckhart Decl., Exh. 5 at 1; *see also* Eckhart Decl., Exh. 33 at 1.

Once again, plaintiffs have failed to establish that the SEHO's determination was incorrect. The SEHO found that K.H. generally understood verbal instructions as well as sign language, and that she responded the same way to speech without sign as she did to speech accompanied by sign. Eckhart Decl., Exh. 1 at 21. There is considerable testimony in the record supporting this conclusion. For example, Brenda Olsen, a classroom assistant who provided sign language support to K.H's for three and a half weeks during the summer of 2004, testified that K.H. generally seemed disinterested in sign language. A.R., 7/28/04 Tr. at 160, 170. Jennifer Chop, K.H.'s teacher during 2002 and 2003, testified that K.H. never initiated sign language with her. A.R., 8/11/04 Tr. at 73. Further, Jack, K.H.'s speech therapist, testified that she used signs with K.H. and that she "never did imitate any of the signs that I tried using with her." A.R., 7/30/04 Tr. at 150. To the contrary, K.H. "gave vocal responses whether

---

[8] Notably, while plaintiffs submitted a declaration from Grandison stating that her 2004 assessment had not intended to comment on the appropriateness of K.H.'s classroom placement, they have not submitted a similar declaration contesting the SEHO's concerns over Grandison's speech therapy recommendations.

United States District Court
For the Northern District of California

or not [she] presented a sign. *Id.* at 151; *see also id.* at 151 ("I presented sign to supplement speech but . . . I didn't see any evidence that it made a difference for [K.H.]"). Others also confirmed this testimony. *See, e.g.*, A.R., 7/29/04 Tr. at 36 ("I did not see her use . . . language. . . . I saw her respond to . . . verbal.").

Plaintiffs again rely on the reports of Grandison and McBride to rebut the SEHO's conclusion. Grandison stated that "[a]lternative modalities such as signing and computer devices should be explored to the fullest." Eckhart Decl., Exh. 7 at 7. McBride's report contradicts the above testimony to a large degree. She found that once she began signing to K.H., K.H. "started initiating conversations about things of interest to her by using distal, iconic gestures and signed words to introduce the topic. She wanted to talk about a roller coaster ride, about the squirrels she feeds outside and about a video she likes." Eckhart Decl., Exh. 12 at 7. McBride concluded that "fluent use of sign benefitted [K.H.] as both a means to clearer understanding of language and as a clearer means of expressing language. Further, [K.H.] especially benefitted from sign paired with speech." *Id.* Thus, McBride recommended that K.H.'s "[t]eachers and aides need to be fluent in, and to consistently use sign language." *Id.* at 13.

Although McBride's report speaks persuasively to the benefits that K.H. receives from sign as her development progresses, the Court does not find it sufficient to undermine the SEHO's decision. The SEHO heard testimony from a number of witnesses who consistently testified that, while sign was generally useful to K.H., fluent sign support would have only had limited benefit. Further, these witnesses had all had significantly more exposure to K.H. than McBride. Thus, while McBride's assessment raises important questions that must be addressed going forward, it is not sufficient to convince the Court that the SEHO erred in her conclusion that K.H.'s sign support was adequate.

**B. Auditory Training and Rehabilitation**

Plaintiffs also argue that K.H. needs auditory training and assistive devices to help her with her auditory comprehension. The SEHO addressed this contention briefly, finding that plaintiffs had provided no evidence in support of this claim save for their contention that K.H. had a hearing impairment. Eckhart Decl., Exh. 1 at 19 ("[T]here was no evidence submitted indicating any sort of need for audiological services."). Plaintiffs have now provided supplemental evidence that they did not

United States District Court
For the Northern District of California

present to the SEHO, including the McBride assessment, and an assessment by audiologist Judith Patton. *See* Eckhart Decl., Exhs. 10, 12.

As discussed above, the SEHO was justified in her determination that hearing impairment was not an area of suspected disability for K.H. Given the plaintiffs' failure to produce any evidence to the SEHO in support of their request for increased auditory training and assistive devices, the Court finds it inappropriate to second-guess the SEHO's decision based upon the supplemental evidence plaintiffs have provided. *See Adams*, 195 F.3d at 1149 ("In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted."). Because it was objectively reasonable to determine that K.H. did not have a hearing impairment at the time of the IEPs at issue, the SEHO did not err in denying plaintiffs' requests.

**III. Least Restrictive Environment**

Plaintiffs' final argument is that K.H.'s placement in a severely handicapped class is not the "least restrictive environment." Both the IDEA and California law require students to be educated with children who are not disabled "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.550(b); Cal. Educ. Code §§ 56031, 56364.2. Plaintiffs argue that, under these provisions, K.H. should be placed in a communicatively handicapped class, not a severely handicapped class, and that she should be "mainstreamed" in a general education class each day.[9]

In determining whether a classroom placement is the least restrictive environment, courts should look to: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; [and] (3) the effect [a student would have] on the teacher and children in the regular class."[10] *Sacramento City Unified Sch. Dist. v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994). The SEHO found that the first factor strongly weighed in favor of placement in a severely handicapped class, the second factor supported placement in a more mainstream setting to a limited

[9]Although plaintiffs fault the SEHO for not considering a "total communication" classroom, the SEHO's decision makes clear that plaintiffs requested placement in a general education class, not a communicatively handicapped class. *See* Eckhart Decl., Exh. 1 at 32, 39.

[10]The Ninth Circuit also identified as an additional factor the costs of mainstreaming a child. That does not appear to be an issue in this case.

degree, and the third factor was mixed. Plaintiffs challenge only the SEHO's conclusion with respect to the first factor.

The SEHO's decision on the academic benefits of the severely handicapped class is thorough and convincing. Four of K.H.'s teachers testified that a special education setting would be the most appropriate setting for her. Eckhart Decl., Exh. 1 at 32-33, 40-42. For example, Davis, K.H.'s kindergarten teacher, testified that she believed the severely handicapped class was the most appropriate placement for her because "the general classroom moves too fast." A.R., 8/12/04 Tr. at 10-11. Diane Lund, a general education teacher who had K.H. in her class for mainstreaming for a portion of every week during 2003, also testified that the severely handicapped class was a better academic setting for her because general education moved too fast. A.R., 7/27/04 Tr. at 65-66. Jennifer Chop, the teacher of a communicatively handicapped class, also testified that a severely handicapped class was the most appropriate setting for K.H. A.R., 8/11/04 Tr. at 46-47. And Theresa Borges, K.H.'s teacher at a private preschool, testified that a severely handicapped classroom would be appropriate. *See* A.R., 7/23/04 Tr. at 130-31 (while K.H. benefitted from being around typically developing children, "[w]e certainly couldn't fulfill all of her needs"), 193-94. Perhaps the most convincing evidence that the severely handicapped classroom was the most appropriate placement for K.H. was Davis's testimony that K.H.'s skills were in the middle of the pack when compared to other students in her severely handicapped class. A.R., 8/12/04 Tr. at 14-15 ("[R]elative to the other . . . eight students [K.H.] fell . . . pretty much right about in the middle. Relative to the four kindergarten students I had, [K.H.] again fell right about in the middle.").

Plaintiffs dispute the SEHO's finding, arguing that access to sign language and to peers with less severe disabilities will help develop K.H.'s communicative skills. But this argument emphasizes the communicative aspects of her development while ignoring her needs in other areas. Plaintiffs also challenge the testimony the SEHO heard regarding K.H.'s cognitive abilities, arguing that K.H.'s communicative problems prevent anyone from getting a true measure of her cognitive abilities. For example, McBride found that "[t]he amount of ideas, needs, and the frequency of [K.H.'s] communication all increased" when she signed to K.H. Stein Decl., Exh. 1 at 22. Based on this conclusion, McBride believed that a total communication classroom was most appropriate for K.H.

Once again, however, the Court finds that the McBride assessment is insufficient to overcome the consistent testimony from teachers that have worked with K.H. for a considerable amount of time. Indeed, McBride did not purport to evaluate K.H.'s cognitive abilities; her assessment was limited to K.H.'s communicative skills.

The SEHO considered a great deal of evidence, the bulk of which led to the conclusion that the "academic benefits of the [severely handicapped class] greatly outweigh[ed]" any developmental benefit. Given the consistent testimony to that effect provided by all of K.H.'s teachers, the Court cannot say that the SEHO's determination was erroneous.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment (Docket No. 67) and DENIES plaintiffs' motion for summary judgment (Docket No. 64).

**IT IS SO ORDERED.**

Dated: July 5, 2006

SUSAN ILLSTON
United States District Judge